MAKAR, J.,
concurring in part and concurring in result with opinion.
Florida Carry, Inc., challenges the University of Florida’s policy that prohibits firearms anywhere on its campus or other properties under the University’s control including in motor vehicles or housing. For simplicity, these two claims are referred to as the motor vehicle claim and the housing claim, respectively. The trial court entered judgment against Florida Carry as to both claims. I concur with affirmance as to the motor vehicle claim and the result as to the housing claim for the reasons that follow. I concur, but without comment, on the immunity claim.

Motor Vehicle Claim

The gist of Florida Carry’s motor vehicle claim is that the University’s changes to its firearms policy did not adequately comply with applicable statutes upheld in this Court’s decision in Florida Carry, Inc. v. UNF, 133 So.3d 966 (Fla. 1st DCA 2013) (en banc) (hereinafter UNF). The trial court concluded that the motor vehicle claim was not justiciable due to the lack of any “actual case or controversy in need of adjudication” because the University had taken steps before Florida Carry filed suit to change its firearms policy to comply with UNF. As explained in that case, it has been lawful for many decades in the State of Florida for persons in lawful possession of firearms to have them in their motor vehicles if securely encased. Our decision recognized the validity of this long-standing right as it applies to universities and colleges.
Prior to our decision in UNF, and like many other universities and colleges, the University prohibited firearms anywhere on its “campus or any land or property occupied by the [University],” except in six circumstances described by the administrative regulation at issue, 2.001, entitled “Possession and Use of Firearms.” Regulation 2.001, along with the six exceptions in subsections (3)(a)-(f), is set out in full in the Appendix as it appears to those who consult it online (this version includes the disputed postscript the University added). See Regulations of the University of Florida UF-2.001, http://regulations.ufl.edu/wp-contenVuploads/2012/09/2001.pdf (last visited October 13, 2015).
Based on the parties’ submissions, the trial court concluded that the University had rapidly complied with the statutes upheld in UNF because it had “expeditiously footnoted” Regulation 2.001 “to make clear that it would not be used to disallow securely encased firearms in vehicles on campus.” Indeed, a postscript[5] was added at the end of the regulation, stating (underlined portions were added later) in full:
Intentj application: As University regulations and their implementation are subject to applicable law, the University will comply with Florida law governing firearms in vehicles under Section 790.25(5), Florida Statutes, including firearms that are securely encased or otherwise not readily accessible for immediate use in vehicles by individuals 18 *153 years old and older, as decided by the First District Court of Appeal on December 10, 2013 (Case No. 1D12-2174).
The latter date was when UNF was first released, the mandate not issuing until March 31, 2014. And, as indicated, the underlined portions were added after Florida Carry had already filed suit.
Affirmance of the motor vehicle claim is appropriate based on the evidence presented to the trial court, which concluded that “clear and undisputed” facts show the University acted quickly to modify Regulation 2.001 to comply with UNF and that Florida Carry was “well aware” of the University’s action. Whatever sentiment a University official may have expressed does not change the fact that additional information was appended to Regulation 2.001 promptly. And the changes to the regulation after Florida Carry filed suit, reflected in the underlined portions of the postscript, were de minimis. The addition of the word “application,” the citation to section 790.25(5), and the inclusion of the case number of UNF are insufficient to raise a genuine issue of material fact on the motor vehicle claim.
All this said, a few points merit discussion. First, it is unclear why the University did not simply add a new subsection— 3(g) — to the list of exceptions in Regulation 2.001 to make clear that “firearms are permitted” in motor vehicles on University property consistent with section 790.25(5) which allows “a person 18 years of age or older to possess a concealed firearm or other weapon for self-defense or other lawful purpose within the interior of a private conveyance, without a license, if the firearm or other weapon is securely encased or is otherwise not readily accessible for immediate use.” § 790.25(5), Fla. Stat.; see § 790.115(2)(a)(3), Fla. Stat. (“[A] person may carry a firearm: ... In a vehicle pursuant to s. 790.25(5); except that school districts may adopt written and published policies that waive the exception in this subparagraph for purposes of student and campus parking privileges.”). Doing so would better inform those to whom the Regulation applies, and take the guesswork out of what the University meant by including its “Intent” at the end- of the Regulation where it could be overlooked or misunderstood. Florida Carry, however, does not quibble with the format of the Regulation, only with whether the University took action swiftly and broadly enough.- The record shows it did.
Second, related to the first point, one of Regulation 2.001’s exceptions, set oüt in' subsection 3(a), appears to violate sections 790.25(5) and 790.115(2)(a)(3) by prohibiting campus residents from possessing secured firearms in theif motor vehicles. It states as follows:
(3)(a) Campus residents are permitted to store firearms in an area designated by the University Police at the University Police Station - only. Firearms in transit to the Police-Station for storage shall enter the campus at the intersection of 13th Street and Museum Road and be taken directly and immediately to the Police Station. Firearms in transit from the Police Station shall be removed from the campus directly and immediately along the same route. Firearms must be unloaded when on the University campus, whether in storage or in transit to or from storage. Authorization must be acquired from the University Police for possession of the firearms while traveling between the storage facility and the campus perimeter. Possession of a firearm anywhere else on campus is prohibited.
§ 2.001(3)(a) (emphasis added). - As indicated, possession of firearms on campus by campus residents is prohibited,' excepting only a strict means of-transporting to, and *154 storing firearms at, the campus police station. At the time of oral argument, counsel for the University informed the panel that although subsection 3(a) was still on the books, the University no longer enforces it in light of the UNF decision. No footnote or other notice draws the reader’s attention to the University’s non-enforcement policy, but Florida Carry has not made it a feature of this appeal, focusing instead on other aspects of the University’s response.
As to both these points, it may be that the University believes that if it formally modifies Regulation 2.001, as opposed to adding a postscript or adopting an unwritten non-enforcement policy as to subsection 3(a), it will avoid running afoul of preemption issues under section 790.33, which Florida Carry believes prohibits the University from enacting policies even if they “tracked perfectly” with state firearms law. Given the broad preemptive scope of the statute, and the penalties that can apply if missteps are made in the promulgation of policies in this field, this apprehension is understandable.
On the record presented and putting the University’s actions in context, the trial court found that no “unlawful enactment or enforcement was imminent” by the University thereby presenting no justiciable controversy. Absent something more, the lack of evidence that the University was poised to act adversely against-those who lawfully have firearms secured in their motor vehicles in compliance with'Florida law supports this conclusion. Prospective relief may be appropriate where it is shown that a recalcitrant defendant, despite ceasing its illegal action, is likely to return to its former ways. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (“It is well settled that ‘a defendant’s voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice ... [I]f it did, the courts would be compelled to leave .[tjhe defendant ... free to return to his old ways.’ ”) (alterations in original) (citations omitted). But no allegation or any showing has been made that the University has or is likely to ignore applicable statutory or caselaw, thereby making affirmance proper.

Housing Claim

Turning to Florida Carry’s housing claim, which it asserted in its representative capacity of student-members who allegedly “reside in UF owned housing,” it becomes apparent that the lack of any identifiable plaintiffs and their housing situations makes adjudication of this claim unworkable. The essence of the housing claim is that students who live in University housing (on- or off-campus) are entitled tó the same constitutional right, here the right to keep and bear arms, that any other persons would have in their homes. The Fourth Amendment applies equally to everyone in their own homes, and so should the Second Amendment and Florida’s counterpart, says Florida Carry.
But attempting to adjudicate the individual claims of student-members — without knowing anything about their specific housing situations or the context of their living arrangements — would amount to rendering a declaratory judgment where the necessary facts are unknown.
[I]t is ■ well-settled that courts will not render, in the form of. a declaratory judgment, what amounts to an advisory opinion at the instance of parties who show merely the possibility of legal injury on the basis of a hypothetical state of facts which have not arisen and are only contingent, uncertain, and rest in the future.
*155 Martinez so. Scanlan, 582 So.2d 1167, 1174 (Fla.1991); see also LaBella v. Food Fair, Inc., 406 So.2d 1216, 1217 (Fla. 3d DCA 1981). Individuals “seeking declaratory relief must show that ‘there is a bona fide, actual, present practical need for the dec-' laration [and] the declaration should deal with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.’” Martinez, 582 So.2d at 1170 (citations omitted). Absent these and other foundational requirements, the controversy lacks the necessary elements to establish a justiciable matter that is within a court’s constitutional powers. Id. That Florida Carry and the University agree that there exists a justiciable controversy does not control: “Even if both parties have no objection to the court entertaining such an action, mere mutual agreement between parties cannot, confer subject-matter jurisdiction upon a court.” Id. at 1171, n. 2.
Such is the case here. Too little is known factually to make what is essentially an as-applied adjudication of how the complex web of Florida’s firearms laws, with an evolving state and federal overlay of constitutional rights as to keeping and bearing firearms, operates in actual practice as to a specific housing situation. The statutory framework at issue may be constitutional as applied to certain portions of the University’s property, such as classrooms, offices, and other similar sensitive areas. The Supreme Court in Heller noted that “nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laios forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.” D.C. v. Heller, 554 U.S. 570, 626-27, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (emphasis added). Longstanding prohibitions of these types have existed for -good reasons; few question the good judgment of limiting those who may keep and bear firearms in public town council meetings, elementary school cafeterias, and high school algebra classes.
But Heller’s list involved places where people don’t typically reside; it did not include what is traditionally considered the “home,” which has explicit protection in Florida. § 790.25(3)(n), Fla,, Stat. (lawful uses include a “person possessing arms at his or her home or place of business”). Accommodation thereby is justified on a case-by-case basis for those situations involving the “home” for purposes of the statute. For example, those who may reside even temporarily at the University’s Institute of Food and Agricultural Science Research and Education Centers, which are located throughout the State (typically in low population, rural areas), have specified firearms rights. § 2.001(3)(d), Fla. Stat. But is the President’s home not entitled to protection, even though it is on the campus? What about guests at a hotel on University property or under its control? These are wholly different contexts requiring more detailed information to pass judgment on which rights are permissible or may be restricted. Our supreme court made clear almost forty-five years ago that the right to keep and bear arms is not absolute and that statutes placing certain restrictions on the right are not “per se unconstitutional.” Rinzler v. Carson, 262 So.2d 661, 667 (Fla.1972). The University’s firearms policy is not per se unconstitutional, but a set of facts may exist where its specific application raises concerns. Id. at 666-67 (strictly interpreting statute forbidding possession of a “machine gun” nonetheless to permit ownership of those lawfully registered under federal laws, and holding that Florida’s Declaration of Rights as to firearms was modified “to *156 bring the protection in line with the phraseology used in the Second Amendment to the Constitution of the United States.”) The analysis in Rinzler was based on a highly detailed set of facts, enabling the supreme court to make an informed judgment.
In this vein, the question of whether a student’s housing arrangement can be considered a “home” and thereby receive the right to keep and bear arms therein requires more detailed facts than have been presented in this case. Factual context matters. “All too often, facts that are important to a sensible decision are missing from the briefs, and indeed from the judicial record.” Richard A. Posner, Reflections on Judging,' 131 (2013). Are cramped dormitory rooms, where up to four students (who may not know each other) are housed temporarily during portions of their college careers, to be considered a “home” in its traditional sense? Do students who live in marital housing on the edge of campus or in housing located off-campus but operated by the University (or owned by the University but privately-operated) reside in homes deserving of protection? Nothing is known about the nature of any plaintiffs individual living arrangement, making a judicial assessment highly problematic.
Given the factual nuances that can exist in the firearms-on-campus debate, and the lack of a clear, justiciable controversy on the sparse record presented, judgment in favor of the University is the correct result and would thereby avoid the difficult statutory interpretation questions for which no clear construction exists. This result also avoids having to make abstract judgments about how those statutes might fare under constitutional scrutiny.
*157 REGULATIONS OF THE
UNIVERSITY OF FLORIDA
2.001 Possession and Use of Firearms.
(1) The possession of firearms on. the University campus or any land or property occupied by the University of Florida is prohibited,
(2) Definitions
(a) The University "campus" is defined for purposes of this regulation to include those lands located in Alachua County, Florida, occupied or controlled by the University of Florida, including premises occupied by fraternities and sororities officially recognized by the University.
(b) The term "firearm" is defined for the purposes of this regulation to have the same meaning set forth in Section 790.001(6), Fla. Stat., provided “firearm” shall also include antique firearms.
(3) Notwithstanding the foregoing, firearms are permitted under the following limited circumstances:
(a) Campus residents are permitted to store firearms in an area designated by the
University Police at the University Police Station only. Firearms in transit to the Police Station for storage shall enter the campus at the intersection of 13th Street and Museum Road and be taken directly and immediately to the Police Station. Firearms in transit from the Police Station shall be removed from the campus directly and immediately along the same route. Firearms must be unloaded when on the University campus, whether in storage or in transit to or from storage. Authorization must be acquired from the University Police for possession of the firearm while *158 traveling between the storage facility and the campus perimeter. Possession of a firearm anywhere else on campus is prohibited.
*157 l
*158 (b) Those presently authorized to possess firearms on the campus are law enforcement members of governmental agencies who are authorized by law to possess firearms, the University Police, the University’s armored car vendor, and the staff of the Florida Museum of Natural History when the firearms are a part of the museum collection and are for the exhibit purposes or used in a specimen collection.
(c) ROTC cadets may drill with unloaded rifles which have the firing pin removed when under the supervision of ROTC officers and cadre..
(d) The following persons are authorized to possess firearms at Institute of Food and Agricultural Sciences Research and Education Centers:
1. Deputized law enforcement officers living at a center who are issued a firearm as part of their employment;
2. Employees engaged in properly permitted wildlife depredation activities carried out to protect research projects being conducted at a center; and
3. Employees temporarily residing at a center, provided die firearm is kept unloaded, equipped with a trigger lock, and locked in a secured location in the residence. In addition to any specific requirements set forth above, firearms shall be handled, used and stored in a safe and responsible manner and in accordance with all applicable laws, rules and regulations. A Center director shall be notified prior to any firearm being.brought onto Center property and shall have the right to prohibit or limit the use, handling or storage of firearms at the Center for foe safety of persons at the Center.
2
*159 (e) Individuals participating in approved firearms education programs conducted on properties designated for 4-H use may utilize firearms on the property, provided firearms shall be handled, used and stored m a safe and responsible manner and in accordance with all applicable laws, rules and regulations. The program coordinator or property manager shall have the right to prohibit or limit the use, handling or storage of firearms on properties designated for 4-H use for the safety of persons on the property,
(0 Should it be necessaiy or desirable for the use of firearms in any of the academic programs of the University, then permission for such use must be applied for and granted by the Provost or designee, Vice President for Business Affairs and the Chief of Police of the University Police Department,
(5) Any student or employee, including faculty, administration, and staff members, shall be immediately suspended for violation of this regulation. When required under applicable university disciplinary regulations or provisions of the applicable collective bargaining agreement, such a suspension shall be interim in nature until a proper hearing can be held by the appropriate hearing body to determine the facts and circumstances of the violation.
Authority: BOG Regulation 1.001.
History-New 9-29-75, Formerly 6C1-2.01, Amended 9-16-99,3-31-06,3-14-08, Formerly 6C1-2.001, Amended 3-16-10.
Intent: As University regulations and their implementation are subject to applicable law, the University will comply with Florida law governing firearms that are securely encased or otherwise not readily accessible for immediate use in vehicles by mdividuals 18 years old and older, as decided by foe First District Court of Appeal on December 10,2013.
3

. Like this footnote, there is typically a number, letter, or symbol of some sort in the primary text that notifies readers to look for a footnote (at the bottom of the page) or end-note (at the end of the applicable section). The University did not use a footnote in its conventional sense, perhaps because it sought to provide notice more expeditiously than a formal change to the regulation would necessitate.